IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,    )
        )
      Plaintiff,    )
        )
v.        )    NO.  CR 06-1022  RB
        )
JOSE MAURICIO VARELA,    )
        )
      Defendant.    )

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** came before the Court on Defendant's (Jose Mauricio Varela) Motion to Suppress Evidence and Statements (Doc. 27), First Supplemental Motion to Suppress (Doc. 30), Second Supplemental Motion to Suppress (Doc. 46), and Motion to Compel Discovery (Doc. 21). Having considered the submissions, arguments of counsel, and being otherwise fully advised, I hereby deny all four motions.

I.    **Background.**

Following a lengthy criminal narcotics-trafficking investigation, an arrest warrant for Varela's arrest and a search warrant for his residence (425 East Fifth Street, Lordsburg, New Mexico) issued on January 10, 2006.[1] Authorities executed the warrants on January 11, 2006 and January 12, 2006. The pending suppression motions challenge the legality of authorities' actions on those dates.

On January 11, 2006, the Border Operations Task Force (BOTF) prepared to execute the

---

[1] A full recitation of the Court's factual findings related to the investigation, which preceded the underlying Indictment, is set forth in the Court's Memorandum Opinion and Order (Doc. 45), filed on October 6, 2006.

aforementioned warrants.[2]  At an "operational briefing" held that afternoon, BOTF Supervising Agent Israel Barrera apprized officers that BOTF: (1) planned to arrest Varela and search his 425 East Fifth Street property; (2) believed Varela to be armed at all times and highly dangerous; and (3) knew that Varela kept an arsenal of weapons inside his home.  Attendees were provided with a physical description of Varela and his vehicle, as well.

Agent Barrera, in detailing the operation plan, underscored that BOTF would not execute the arrest warrant at Varela's residence.  Instead, authorities would apprehend him, and begin the search of 425 East Fifth Street, only after Varela had left the property.  Agent Barrera explained that it was important that Varela not be allowed to return to 425 East Fifth Street once the BOTF operation began because Varela might barricade himself inside the residence, placing officers, the public, and Varela, at great risk.

Lordsburg Police Department Officers Arthur de la Garza ("AG") and Elijah de la Garza ("EG") attended the January 11, 2006 operational briefing.  Later, at approximately 7:00 p.m. that evening, Officer EG located Varela driving east on Motel Drive in Lordsburg.  Officer EG contacted Officer AG - who was traveling west on Motel Drive - with this information.  Shortly thereafter, Officer AG spotted Varela's Ford Thunderbird turning right (south) off Motel Drive and onto Shakespeare Street.  The officer then followed Varela as he turned left (east), off Shakespeare Street, onto Fourth Street.  After he turned right (south) onto Pyramid Street, Officer AG activated his emergency lights to effect the arrest warrant.

Varela stopped his vehicle on the west side of Pyramid Street.  Officer AG pulled his patrol

---

[2]BOTF is a collaborative law-enforcement initiative involving officers from federal, state, and local agencies.

2

unit directly behind the Ford Thunderbird.  As he approached on foot, the officer- at a distance of approximately 12 feet - yelled to Varela, ordering him to make his hands visible.  Varela did not respond.  He looked straight ahead, made no eye contact with the officer, and did not roll down his car window.[3]  Meanwhile, Officer EG arrived and stopped his patrol unit, facing north, on the east side of Pyramid Street.  As Officer AG neared Varela's vehicle, Varela fled.

A high-speed pursuit ensued: Varela turned from Pyramid Street, left (east) onto Fifth Street, left (north) onto Chester Street, and left (west) into the ally behind his 425 East Fifth Street residence. Officers AG and EG testified that - traveling at approximately 45 to 50 miles per hour (mph) in a 25 mph residential zone - Varela ran the stop sign at the intersection of Fifth and Animas Streets.  The officers watched as Varela nearly hit a vehicle traveling northbound on Animas Street.[4]  Continuing east on Fifth Street, Varela ran the stop sign turning left (north) onto Chester Street.  The officers continued to pursue Varela as he turned (west) off Chester Street into the ally behind 425 East Fifth Street.

The chase ended when Varela stopped his vehicle inside the backyard, approximately 15 to 20 feet from the residence's back door.  Officer AG pulled onto the 425 East Fifth Street property directly behind Varela; Officer EG parked behind Officer AG's unit.

Jumping out of his patrol unit, approximately 20 to 25 feet from Varela, Officer AG repeatedly ordered Varela to "show his hands" and "drop to the ground."  Varela stepped out of the vehicle (between the Ford Thunderbird's frame and the open driver-side door), but did not otherwise

---

[3]Officer AG testified that drivers typically roll down their window after being pulled over.

[4]There is no stop sign for northbound traffic at the intersection of Fifth and Animas Streets.  Thus, accordingly to Officer AG, the northbound vehicle had the right of way.

respond. Because Varela was standing with his back to him, Officer AG could not see Varela's hands. The officer proceeded to "angle" - i.e., move to the side - until he could see that Varela's hands were empty.

Officer AG testified that, throughout this period, he repeatedly and loudly ordered Varela to: (1) lay on the ground; and (2) place his hands in the air. Varela failed to respond, much less adhere, to either command. Consequently, the officer attempted to employ an "armbar" maneuver to forcibly take down Varela. This proved unsuccessful: Varela's stocky, strong frame stiffened and spun away from Officer AG.

At this point, Officer EG - standing just behind Officer AG - stowed his service weapon and prepared to use his Taser gun. Officer EG discharged one Taser burst into Varela's chest.[5] Varela immediately fell to the ground, face down, with his arms underneath him. The officers - both of whom stated that they had personally experienced being shot with a Taser gun - testified that individuals recover fully from being shot with a Taser within seconds. Even after some time had elapsed, however, Varela remained noncompliant and failed to respond to the officers' repeated orders. As a result, Officer EG shot Varela with a second Taser burst. At that point, the officers were able to handcuff Varela and place him into custody.

The officers testified that, pursuant to LPD policy, if an individual is noncompliant or otherwise resists arrest it is proper for an officer to employ a Taser gun. Under LPD protocol, a Taser is considered commensurate to, but more effective than, "O.C." or "pepper" spray.

Officer AG and Officer EG testified that the scuffle lasted approximately thirty seconds. Although Varela sustained no immediately visible burn from the Taser, the officers - as per LPD's

---

[5]A single Taser shot lasts five seconds, conducting 50,000 volts to the point of contact.

Taser policy - summoned paramedics to the scene.  The paramedics promptly cleared Varela and authorities transported him to the LPD detention facility.

Shortly after Varela was handcuffed, Agent Barrera arrived at 425 East Fifth Street with the remaining BOTF team.  BOTF agents proceeded to execute the search warrant on the 425 East Fifth Street residence and Varela's vehicle.  The underlying search warrant authorized BOTF agents to search for the "person or property described in the [attached] Affidavit" and directed authorities to "prepare a written inventory of any person or property seized."  (Def.'s Mot. Suppress Ex. B (Search Warrant).)  The property described in the supporting affidavit, included: (1) "Methamphetamines [sic] . . . . and all paraphernalia being used for [drug distribution] . . . " (*Id.*); (2) "Firearms" (*Id.*); and (3) "all vehicles located on . . . the property at the time of execution" of the warrant.[6]  (Govt's Suppression Hr'g Ex. 2 (Barrera Aff. at 1, Search Warrant).)

---

[6]The only reference to vehicles in the arrest warrant affidavit ("AWA") appears on the first page. Notably, however, the existence of this page was not disclosed by the Government until October 4, 2006.  Prior to that time it appeared - to counsel, as well as the Court - that the search warrant did not expressly cover vehicles situated on the 425 East Fifth Street premises.

At the October 5, 2006 motion hearing, the Government and Agent Barrera (the affiant) explained that this oversight was attributable, simply, to "human error."  Having questioned counsel and Agent Barrera under oath, the Court finds their explanation - though unsatisfactory - credible, particularly because the document supports the Government's position regarding BOTF's search of Varela's vehicle on January 11, 2006 and January 12, 2006.

The Court granted Varela leave to file a supplemental suppression motion in light of these events.   In his Second Supplemental Motion to Suppress, Varela maintains that BOTF agents' search of his vehicle was unlawful notwithstanding the Government's October 4 disclosure.  Specifically, Varela renews his challenge to the AWA in arguing that, to the extent the AWA refers to vehicles located on the 425 East Fifth Street property, the affidavit lacked probable cause.  Therein, he underscores that the AWA "continually" identifies "the *residence*, and *not to the vehicles*" as being the situs for Varela's alleged criminal narcotics trafficking.  (Def.'s Second Supp. Mot. Suppress ¶7 (emphasis added).)  As such, Varela argues that the search warrant was unlawful and all evidence derived therefrom must be suppressed.  Varela's motion does not address whether the vehicle fell within the residence's curtilage.

For the reasons discussed herein, the Court finds that BOTF's vehicle search was lawful.  *See* Part III.  Assuming *arguendo* that Varela's challenges to AWA page one are correct, if those portions of the affidavit were stricken, the AWA still demonstrated probable cause to search the 425 East Fifth Street residence.  (*See* Mem. Op. & Order of 10/6/06).  Because Varela's vehicle was within the curtilage of the 425 East Fifth Street residence, BOTF's search of Varela's car fell within the scope of the search warrant.  On this basis, as well as for reasons discussed below, the vehicle search was lawful.

The search, however, was suspended shortly after it began on January 11, 2006 due to concerns for law-enforcement safety. The reasons were two fold. First, approximately fifteen minutes into the BOTF's protective sweep, an officer found what appeared to be a rigged explosive device.[7] Explosive experts with the New Mexico State Police (NMSP) were contacted and the search was suspended. Second, authorities also detected an apparent gas leak sometime after the protective sweep began. Thus, the premises - namely, the residence and the yard immediately surrounding it - were evacuated. Authorities were forced to pull back to the back ally.

Although the gas leak was apparently resolved quickly, the NMSP explosives team was engaged in Santa Fe the evening of January 11, 2006. Consequently, the 425 East Fifth Street premises were secured with crime-scene tape and officers remained on-site overnight.[8]

After NMSP deemed the premises safe on January 12, 2006, BOTF agents resumed searching Varela's residence and vehicle at approximately 10 a.m. In searching Varela's vehicle, officers found two firearms and methamphetamine. BOTF Agent Diaz found a "gunk can" - which contained the methamphetamine - between the passenger-side seat and floorboard. The narcotics were discovered after a canine unit alerted to that area of the car. After the vehicle had been photographed and "impounded," Agent Barrera conducted an "inventory search" of Varela's Ford Thunderbird on January 12, 2006.

---

[7]Agent Barrera testified that the officer - who was familiar with explosives - spotted blasting caps inside a safe. The safe, measuring roughly two feet by two feet, was found laying on its side. He stated that the blasting caps were visible because the safe's door was off its hinges, simply placed on top of the safe.

[8]Officer EG provided detailed testimony regarding his surveillance of the premises that evening. He specifically testified that flood lights illuminated the property throughout the night and that he triggered the motion sensor as necessary. From his vantage point, he was able to see the main (back) entrance to the 425 East Fifth Street, as well as Varela's Ford Thunderbird. He confirmed that no one entered or left the premises that evening. Officer EG was one of two policeman entrusted with guarding the scene overnight.

Agent Barrera testified that the car was registered in Varela's name, as well as to a Juanita Varela. He stated that he did not know who Juanita Varela was and had - while investigating Varela over the preceding months - only seen the defendant drive the vehicle. The agent confirmed that he had no information or evidence that Varela had conducted criminal narcotics trafficking from the vehicle. Agent Barrera also testified that no contraband was visible from outside the car.

Ultimately, authorities' search of Varela's vehicle yielded: methamphetamine (235 grams) and two handguns (presumably the weapons named in Count 2 of the Indictment). (*See* Def.'s Mot. Suppress 2.) The search of the residence revealed: drug-distribution paraphernalia and at least nine firearms (named in Count 3 of the Indictment). (*See id.*) On May 10, 2006, a federal grand jury indicted Varela with: (1) Possession with Intent to Distribute 50 grams and more of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841 (b)(1)(A) and 18 U.S.C. § 2 (Aiding and Abetting); (2) Carrying a Firearm During and in Relation to a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (3) Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).

## III.    Motion to Suppress.

This Court, in its Memorandum Opinion and Order (Doc. 45) filed October 6, 2006, found the underlying arrest warrant and search warrant legal.[9]  Therein, the Court rejected Varela's arguments to the contrary that he set forth in his Sealed Request for a Hearing Pursuant to *Franks v. Delaware* (Doc. 31) and the pending suppression motion. As a result, only two issues raised in Varela's suppression motion remain unresolved. They are: (1) whether officers' search of Varela's

---

[9]For the reasons previously noted, *see infra* note 6, Varela's Second Supplemental Motion to Suppress does not disturb the Court's ruling.

vehicle - located in the backyard at 425 East Fifth Street - offended the Fourth Amendment; (2) whether officers employed unlawful, excessive force in arresting Varela on January 11, 2006. These issues are addressed in turn.

**A.     Vehicle search did not violate the Fourth Amendment.**

The Fourth Amendment proscribes "unreasonable searches and seizures" by government agents.  U.S. CONST. amend. IV.  The Tenth Circuit recognizes that its "cases stand for the illuminating proposition that warrantless searches are per se unreasonable, except, of course,  when they are not."  *United States v. Najar*, 451 F.3d 710, 713 n.1 (10th Cir. 2006) (citations omitted).

Varela seeks suppression of evidence obtained from BOTF's initial vehicle search on January 11, 2006 because: (1) no warrant issued for the car; (2) "no probable cause existed to believe that the car . . . was involved in crime"; and (3) it did not constitute a "search incident to arrest" as he was already in custody.  (Def.'s Mot. Suppress 5; Def.'s First Supp. Mot. Suppress 1.)  Additionally, Varela  seeks suppression of the fruits of the January 12, 2006 vehicle search arguing that: (1) "[n]o exception to the warrant requirement is available the day after an arrest" (Def. Mot. Suppress 5); and (2) in any case, "[a]gents were required to obtain a warrant to search the "Gunk" can that allegedly contained the methamphetamine."  (Def.'s First Supp. Mot. Suppress 1.)  Varela's arguments are unavailing.

First, it is clear that the search warrant authorized BOTF officers to search the vehicle.  "A search warrant authorizing a search of a certain premises generally includes any vehicles located within its curtilage if the objects of the search might be located therein."  *United States v. Gottschalk*, 915 F.2d 1459, 1461 (10th Cir. 1990), *cited with approval in United States v. Sturmoski*, 971 F.3d 452 (10th Cir. 1992) (horse trailer discovered in curtilage of a residence fell within the scope of a

search warrant for that premises); *United States v. Larson*, 63 F. App'x 416, 423 (10th Cir. 2003) (car not owned by defendant, but found in locked storage unit that defendant "rented and controlled," was "clearly within scope of search warrant" for storage unit even though "neither the affidavit nor the search warrant mentioned the van or its owner"); *see also United States v. Patterson*, 278 F.3d 315, 318 (4th Cir. 2002) ("the fact that [defendant's car] was not itself listed in the search warrant does not require exclusion of the firearm [found in that vehicle] from evidence" because "[w]here a warrant authorizes the search of an entire property or premises, the scope of the warrant includes automobiles on the property or premises that are owned by . . . and control of the premises owner . . ."); *see also United States v. Jones*, No. 05-0386, __ F. Supp. 2d __, __, 2006 WL 2355964, *13 (D.D.C. Aug. 10, 2006) ("Courts have consistently held that a search of 'the premises' of a home includes vehicles located within its curtilage.") (collecting cases and citing, *inter alia*, *Gottschalk*, 915 F.2d at 1461). There is no question that, prior to the vehicle search, BOTF agents saw Varela driving the Ford Thunderbird and confirmed that his name appeared on the car's registration. Likewise, authorities had reason to believe that Varela's car might - as, indeed, it did - contain the "objects of" the search warrant for 425 East Fifth Street. Thus, if Varela's car was located within the residence's curtilage when BOTF effectuated the warrant on January 11, 2006 and January 12, 2006, the vehicle fell within the warrant's scope.

Traditionally, the curtilage concept gives Fourth Amendment protection to "the area immediately surrounding a dwelling house." *United States v. Cousins*, 455 F.3d 1116, 1121-22 (10th Cir. 2006) (internal quotation marks and citation omitted). Four factors are "used to determine whether a particular area was within the curtilage of a house: (1) the proximity of the area to the house; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of

the use to which the area is put; and (4) the steps taken by the resident to protect the area from

observation." *Id*.  Notably, these considerations:

> are not a "finely tuned formula," but "are useful analytical tools only to the degree
> that, in any given case, they bear upon the centrally relevant consideration--whether
> the area in question is so intimately tied to the home itself that it should be placed
> under the home's 'umbrella' of Fourth Amendment protection."

*Id*. (quoting *United States v. Dunn*, 480 U.S. 294, 300 (1987)).

Here, when BOTF effectuated the search warrant, the vehicle was well within the 425 East

Fifth Street residence's curtilage.  As noted above, Officer AG observed Varela stop his vehicle

approximately 15 to 20 feet from the 425 East Fifth Street residence.  The car was situated

completely within Varela's backyard, which is - for the most part - enclosed by a railroad-tie fence.

It is beyond question that Varela evidenced control over the car given that he used it to flee Officer

AG after being pulled over along Pyramid Street.  Additionally, BOTF agents verified that the vehicle

was registered, *inter alios*, to Varela.  Therefore, BOTF's vehicle search, carried out on January 11,

2006 and January 12, 2006, fell within the scope of the underlying search warrant for 425 East Fifth

Street.[10]  (*See* Def.'s Mot. Suppress Ex. B (Search Warrant).)

As such, Varela's claim that authorities required a warrant to search the "Gunk" container -

from which BOTF seized 235 grams of methamphetamine - is, therefore, without merit.  The search

warrant expressly authorized BOTF to search for narcotics.  (*Id*.)  Even though the cannister's precise

dimensions remain unclear, it is uncontroverted that it contained methamphetamine.  Furthermore,

---

[10]To the extent BOTF's initial search of Varela's car was part of its security sweep on  January 11, 2006,
it was also warranted under the "exigent circumstances" exception.  *See United States v. Thomas*, 372 F.3d 1173,
1178 (10th Cir. 2004).  Where "exigent circumstances" exist and officer safety is at issue, authorities may
reasonably conduct a sweep of the surrounding area - including the vehicle - without a warrant.  *See id*. (citations
omitted).  Of course, the "exigent circumstances" exception to the warrant rule is inapplicable to the January 12,
2006 vehicle search.

the legality of authorities' actions in extracting the cannister is bolstered by the fact that, prior to its recovery, a police-dog apparently alerted to the area of the car where the gunk can was found. *See generally United States v. Rosborough*, 366 F.3d 1145, 1153 (10th Cir. 2004) (recognizing the reliability of "an alert by a trained drug sniffing dog"). Absent any evidence that authorities "flagrantly disregard[ed] the terms," or "grossly exceed the scope," of the search warrant, BOTF agents' seizure and search of the Gunk can was lawful. *See United States v. Sell*, No. 04-5167, __ F.3d __, __, slip. op. at 27 (10th Cir. Sept. 19, 2006) (internal quotation marks and citation omitted).

Second, in any event, the fruits obtained from officers' search of Varela's vehicle may fall within the "inevitable discovery doctrine." The Supreme Court "has recognized" that the "'ultimate or inevitable discovery exception to the exclusionary rule'" applies "when 'the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . .'" *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)).

Notably, those "lawful means include an inventory search." *Id.*; *e.g.*, *United States v. Ibarra*, 955 F.2d 1405, 1410 (10th Cir. 1992) ("[I]f evidence seized unlawfully would have been inevitably discovered in a subsequent inventory search, such evidence would be admissible."). It "is common practice for the police to conduct an inventory of the contents of vehicles they have taken into their custody or are about to impound." *Tueller*, 349 F.3d at 1243 (internal quotation marks and citations omitted). And, while "inventory searches need not be supported by a warrant or probable cause," they are nevertheless "restricted":

> First, they are reasonable only if conducted according to standardized procedures.
> Second, the policy or practice governing inventory searches should be designed to
> produce an inventory, . . . in other words, an inventory search must be justified by the

11

administrative purposes of such searches.  An inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.

*Id*. (internal quotation marks and citations omitted).

Here, Agent Barrera testified that it is standard procedure to conduct a vehicle inventory of a vehicle driven by a suspect in fleeing authorities.  He explained that, under such circumstances, the vehicle itself is evidence of that crime.  Given that Varela fled after Officer AG pulled him over along Pyramid Street, the Government demonstrated that the Ford Thunderbird driven by Varela would have been impounded, subject to an inventory search, and, thus, the contraband found in the vehicle would have been "inevitably discovered."  *See id*.  The BOTF agents' vehicle search was lawful.

**B.      No excessive force employed in arresting Varela.**

Varela also argues that Officers AG and EG used excessive force when they shot him twice with a Taser gun on January 11, 2006.  In his motion, Varela underscores the following:

He is a 59 year old man who suffers from numerous ailments. He is well known to the Lordsburg police.  His home had been under surveillance for at least a year at the time he was arrested.  Police had no reason to believe that he was going to disappear from their sight.

(*Id*.)  Accordingly, he claims that the "excessive force used . . . necessitates suppression of all the evidence."  (*Id*.)  The Government, conversely, maintains that "the use of a Taser [sic] was necessary, proportional and not excessive."  (Govt.'s Resp. Def.'s Mot. Suppress 9.)

"Claims that law enforcement officials have used excessive force in the course of an arrest . . . are most properly characterized as involving the protection of the Fourth Amendment."  *Cruz v. City of Laramie, Wyo*., 239 F.3d 1183, 1188 (10th Cir. 2001) (citing *Graham v. Connor*, 490 U.S. 386 (1989)) (internal quotation marks and additional citation omitted).  Plainly, a seizure's "'reasonableness depends on,'" *inter alia*, "'*how it is carried out*.'"  *Holland ex rel. Overdorff v.*

12

*Harrington*, 268 F.3d 1179, 1188 (10th Cir. 2001) (emphasis in original) (quoting *Tennessee v.
Garner*, 471 U.S. 1, 7 (1985)).  The Fourth Amendment "'reasonableness' inquiry turn[s] on whether
the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting
them, without regard for their underlying intent or motivation.'"  *Cruz*, 239 F.3d at 1188 (citing *Mick
Brewer*, 76 F.3d 1127, 1136 (10th Cir. 1996)).

>   This objective inquiry:

>   "requires careful attention to the facts and circumstances of each particular case,
>   including the severity of the crime at issue, whether the suspect poses an immediate
>   threat to the safety of the officers or others, and whether he is actively resisting arrest
>   or attempting to evade arrest by flight."

*Cortez v. McCauley*, 438 F.3d 980, 993 (10th Cir. 2006) (quoting *Graham*, 490 U.S. at 396).
Additionally, the Court's analysis "'must embody allowance for the fact that police officers are often
forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly
evolving--about the amount of force that is necessary in a particular situation.'"  *Id*. at 993-94
(quoting *Graham*, 490 U.S. at 396-97).  "'The right to make an arrest . . . necessarily carries with
it the right to use some degree of physical coercion.'"  *Id*. at 993 (quoting *Graham*, 490 U.S. at 396
("not every push or shove, even if it may later seem unnecessary . . . violates the Fourth
Amendment.")).

>   Authorities' use of a Taser gun in effecting Varela's January 11, 2006 arrest was
constitutional.[11]  As noted above, Officers AG and EG testified that LPD policy permits a Taser gun

---

[11]Here, the Government contests whether Varela's excessive force claims bore a sufficient nexus to the
evidence authorities discovered thereafter.  Federal courts do not unanimously agree that unconstitutionally
excessive force employed by police against a defendant during an arrest warrants suppression.  *See e.g.*, *United
States v. Hernandez-Garcia*, 284 F.3d 1135, 1140 (9th Cir. 2002) (finding no excessive force and declining to
suppress the evidentiary fruits of the same, but in so doing distinguishing *Graham v. Connor*, 490 U.S. 386 (1989),
as "concerning the unreasonable use of force for purposes of a civil lawsuit").  Indeed, litigation concerning alleged

to be employed where a suspect is noncompliant or otherwise resists arrest.  Undoubtedly, Varela resisted arrest and Officer EG's decision to shoot Varela twice with the Taser gun was objectively reasonable.

The following factors make this conclusion evident: (1) when Officer AG attempted to apprehend Varela by using the armbar maneuver, Varela spun away and continued to resist arrest; (2) from their training and being shot by a Taser gun themselves, Officers AG and EG knew that - within seconds - individuals recover fully; (3) given that he responded to Officers AG's order to exit his vehicle after arriving at 425 East Fifth Street, the officers reasonably believed that Varela could hear and understand them; (4) after Officer EG shot him the first time, Varela failed to comply - even after several seconds elapsed - with the officers' repeated orders and continued to resist arrest; (5) the scuffle with Varela transpired only feet from the residence; (6) Varela was not handcuffed when Officer EG shot him either the first or second time and neither Officer AG nor EG's service weapons were drawn when the Taser was employed; (7) Varela was promptly cleared by paramedics who responded to the scene; (8) from the BOTF operational briefing, Officers AG and EG knew that Varela was (i) wanted in connection with serious felony narcotics-trafficking activity, (ii) believed to be dangerous and armed at all times, and (iii) thought to have weapons stashed inside his residence;

---

excessive force related to arrests overwhelmingly arises in "civil or criminal proceedings against the officer." WAYNE. R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 5.1(d) (4th ed. 2004).
Notably, however, at least one leading treatise indicates that the "use of excessive force in making arrest" *does* affect the "legality of the arrest" such that suppression is necessary.  *Id.*  LaFave reasons persuasively that:
> [g]iven the fact that an arrest will necessitate suppression of evidence obtained incident thereto if the arrest is accomplished by an unnecessary breaking into premises for purposes of arrest, the same should be true when it is accomplished by an unconstitutional use of force against the person.

*Id.*  In any event, as noted above, the Court need not squarely address this issue to resolve Varela's excessive force claim.

and (9) Varela's arrest occurred after he led Officers AG and EG on a high-speed chase through Lordsburg, running stop signs and nearly colliding with a vehicle and a utility pole.

Recognizing that excessive force claims "require[] careful attention to the facts and circumstances of each particular case, including the *severity of the crime at issue*, whether the suspect poses an *immediate threat to the safety of the officers or others*, and whether he is *actively resisting arrest* or attempting to evade arrest by flight," this Court has little difficulty in concluding that no excessive force was employed during Varela's arrest on January 11, 2006. *Cortez*, 438 F.3d at 993 (quoting *Graham*, 490 U.S. at 396) (emphasis added).[12]

## IV.   Motion to Compel Discovery.

Varela's Motion to Compel requests numerous items of discovery. The Government filed a substantive response; Varela filed a reply thereto. Following the Government's Response, the Court's Memorandum Opinion and Order (Doc. 45), and the October 5, 2006 motion hearing, only two items remain contested.

First, Varela seeks the "name and last known address of each prospective government witness." (Def.'s Mot. Compel ¶10.) The Government objected and refused to disclose its witness list, arguing that Varela failed to "demonstrate[] any compelling reason the government in this case

---

[12]The courts of appeal have not found Taser guns to constitute excessive force per se. *E.g.*, *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004) ("Although being struck by a taser [sic] gun is an unpleasant experience, the amount of force [the officer] used-a single use of the taser [sic] gun causing a one-time shocking-was reasonably proportionate to the need for force and did not inflict any serious injury."); *City of Cincinnati v. Russo*, 953 F.2d 1036, 1044-45 (6th Cir. 1992) (officer entitled to qualified immunity despite shooting suspect with Taser gun multiple times after suspect no longer posed an immediate threat because officer's "actions were intended to avoid having to resort to lethal force"); *see also e.g.*, *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 781-82 (10th Cir. 1993) (use of stun gun not "excessive force" where suspect actively resisted arrest).

Indeed, at least one court has recognized that employing a Taser gun can, under certain circumstances, prevent injuries by avoiding "serious physical struggle[s]" between an officer and a suspect. *See, e.g., Draper*, 369 F.3d at 1277-78 ("the police video shows that Draper was standing up, handcuffed, and coherent shortly after the Taser gun stunned and calmed him").

should provide such a list." (Govt's Resp. Def.'s Mot. Compel 3.)

The "Sixth Amendment's Compulsory Process Clause 'establishes, at a minimum, that criminal defendants have the right to the government's assistance in compelling the attendance of favorable witnesses at trial and the right to put before a jury evidence that might influence the determination of guilt.'" *United States v. Serrano*, 406 F.3d 1208, 1215 (10th Cir. 2005) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). But "[a] defendant's right to present a defense is not absolute." *Id.* (citation omitted).

Indeed, it is widely recognized that "a defendant in a non-capital case has no right to discover lists of prospective government witnesses." *United States v. Metro. Enters., Inc.*, 728 F.2d 444, 451 (10th Cir. 1984) (citing *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977)); *accord United States v. Napue*, 834 F.2d 1311, 1317 (7th Cir. 1987) (citing *Weatherford*, 429 U.S. at 559) ("The government is not required to provide a defendant with a list of all prospective government witnesses.") (same); *United States v. Wieburg*, No. 90-8068, 933 F.2d 1019, 1991 WL 85358, **3 (10th Cir. May 21, 1991) (unpublished table decision) (same). Some courts, however, have ordered the prosecution to disclose its witness lists "upon a showing of compelling need." *United States v. Johnson*, No. 96-40082-02-SAC, 1997 WL 447681, *4 (D. Kan. Jun 09, 1997) (citing *United States v. Madeoy*, 652 F. Supp. 371, 375 (D.D.C.1987)); *accord United States v. Blackman*, No. 06-CV-50-2F1, 2006 WL 2792296, *1 (E.D.N.C. Sept. 27, 2006) (citing, *inter alia*, *United States v. Price*, 448 F. Supp. 503, 507 (D. Colo. 1978)) ("[T]o obtain a government witness list, a defendant must make a specific or 'particularized' showing that such disclosure is both material to the preparation of his defense and reasonable in light of the circumstances."); WAYNE. R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 20.3(h) (4th ed. 2004) (same).

16

Accordingly, best practices dictate that, to be entitled to the Government's non-expert witnesses, Varela must make a showing of need.  *Compare* FED. R. CRIM. P. 16(a)(2) ("Except as Rule 16(a)(1) provides otherwise, this rule does not authorize discovery or inspection of . . . . internal government documents made by an attorney for the government . . . ."), *with* FED. R. CRIM. P. 16(a)(1) (not including prosecution witness lists in identifying "Information Subject to Disclosure"). Given that Varela failed to make such a showing - either in his briefing or at the motion hearing - the Government need not disclose this information.

Second, Varela requests disclosure of the grand jury's: (1) minutes "to determine whether there has been compliance with Rule 6 with regard to attendance and the number of grand jurors voting on this indictment"; and (2) the transcript from its proceedings.  (Def.'s Mot. Compel. ¶¶ 17-18.)  The Government objects: "the defendant has not articulated any legitimate purpose for this Court to order [disclosure of] otherwise secret Grand Jury proceedings." (Govt's Resp. Def.'s Mot. Compel 4 (citing FED. R. CRIM. P. 6(e)(2)).)

In response, and in support of pre-trial disclosure of the requested grand jury materials, Varela stated that: (1) "[p]retrial disclosure will expedite" the trial because, given that after any witness testifies, their grand jury testimony becomes discoverable pursuant to FED. R. CRIM. P. 26.2, defense counsel "will request a recess during trial or a continuance after that witness testifies . . . to review their grand jury testimony"; (2) the grand jury testimony of witnesses who do not "testify at trial" is "otherwise relevant by definition"; and (3) if the Court declines to order disclosure, "counsel requests that the court conduct an *in camera* review of the proceedings to determine if any testimony is relevant or material, thereby requiring disclosure."  (Def.'s Reply Govt's Resp. Def.'s Mot. Compel 2.)

17

As the Tenth Circuit has succinctly explained:

The Supreme Court has consistently recognized that the proper functioning of the grand jury system depends upon the secrecy of the grand jury proceedings. Secrecy, however, is not absolute. Rule 6(e) of the Federal Rules of Criminal Procedure provides exceptions to the general rule. Under FED. R. CRIM. P. [6(e)(3)(E)(i)], grand jury materials may be disclosed "when so directed by a court preliminarily to or in connection with a judicial proceeding." A district court may properly order release of grand jury materials *after a party demonstrates the necessity for them with particularity*.

*In re Special Grand Jury 89-2*, 143 F.3d 565, 569 (10th Cir. 1998) (emphasis added) (quotations to case law and citation thereto omitted). "Disclosure of grand jury materials is appropriate only where the need for disclosure outweighs the public interest in the secrecy of the proceedings." *In re Lynde*, 922 F.2d 1448, 1452 (10th Cir. 1991) (internal quotation marks and citation omitted).

Varela did not make the requisite showing of need regarding the grand-jury transcript and minutes. The Court is not convinced that Varela's "expediting" rationale for the grand jury materials constitutes good cause. Certainly, it is not extraordinary: if accepted, this rationale would allow for grand jury material disclosure in the vast majority of cases. Accordingly, to the extent they are not otherwise discoverable under the Jenks Act, *see* 18 U.S.C. § 3500, the Government need not disclose these materials.

**V.      Conclusion.**

For all the foregoing reasons, Varela's Motion to Suppress Evidence and Statements (Doc.

27), First Supplemental Motion to Suppress (Doc. 30), Second Supplemental Motion to Suppress

(Doc. 45), and Motion to Compel Discovery (Doc. 21) are **DENIED**.

**IT IS SO ORDERED**.

_____
**ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE**

19